**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| COMPLETE BUSINESS SOLUTIONS GROUP, LLC,<br>Plaintiff,<br><br>v.<br><br>SEAN WHALEN and<br>YINGYIN IRIS CHEN<br>Defendants. | CIV. A. NO: 19-cv-06181-JS |
| SEAN WHALEN,<br>YINGYIN IRIS CHEN and<br>FLEXOGENIX GROUP, INC., individually and on behalf of all those similarly situated,<br><br>Counterclaim Plaintiffs,<br><br>v.<br><br>GEMJ CHEBHEAR GRAT, LLC, JOSEF CHEHEBAR, and ISAAC SHEHEBAR,<br><br>Counterclaim Defendants. | |

**DEFENDANTS' AMENDED CLASS-ACTION COUNTERCLAIMS**

Counterclaim Plaintiffs Sean Whalen and Yingyin Iris Chen, and Plaintiff Flexogenix Group, Inc. (collectively, "Counterclaim Plaintiffs"), by their attorneys, White and Williams LLP, as and for their counterclaims allege:

**INTRODUCTION**

**A. The Purpose of this Action**

1. This class action lawsuit seeks damages sustained by small businesses and their owners who were financially ruined by a RICO Enterprise involving Complete Business Solutions

Group, Inc. ("CBSG"), and its mastermind, Joseph LaForte ("LaForte"), who, along with numerous other RICO Members, collected hundreds of millions of dollars of usurious debt from Plaintiffs and the Class Members from 2016 to the present.

2. Although many RICO Members are currently subject to criminal RICO actions both in Philadelphia and Brooklyn due to their wide-ranging, multiple criminal schemes, this civil class action seeks redress for a distinct group of victims: The many thousands of merchant victims who have been terrorized by the Enterprise's collection of unlawful debt.

3. To effectuate its unlawful scheme, the Enterprise disguised its criminally usurious loans as merchant cash advance agreements ("MCA Agreements"), whereby the Enterprise falsely represented on paper that the transactions were sales of receivables. They were not.

4. Contrary to the Enterprise's sham cover, each of the transactions was an absolutely repayable loan in substance, form, and practice.

5. The interest rates charged by the Enterprise exceeded 100%.

6. The Chehebars were an integral part of the Enterprise.

7. Specifically, between at least 2016 and 2020, the Chehebars provided more than $48 million in seed money to the Enterprise to fund the criminally usurious loans.

8. The capital provided by the Chehebars was issued in their private capacity as insiders who had unfettered access to the Enterprise's books and records and did so with full knowledge of the LaForte's vast criminal background, their ties to organized crime, and the unlawful loansharking scheme at issue here. *See* Ex. A (Draft Chehebar Declarations).

9. The capital provided by the Chehebars was a private family affair wherein the Chehebar family sought to reap millions of dollars from their willful and knowing participation in

the Enterprise's illegal loansharking scheme. The names and known amounts provided by the Chehebar family are at least as follows:

| FAMILY MEMBER | PRINCIPAL AMOUNT |
|---|---|
| Albert Chehebar | $15,500,000 |
| Cherie Chehebar (Eddie) | $150,000 |
| Ezra Chehebar (Eddie) | $2,500,000 |
| Ezra Shehebar (Zudy) | $1,600,000 |
| GEMJ Chehebar GRAT, LLC | $4,400,000 |
| Isaac Benitah | $2,000,000 |
| Isaac Shehebar | $10,000,000 |
| Josef Chehebar (JoJo) | $2,200,000 |
| Joyce Chehebar (Eddie) | $225,000 |
| Michael Chehebar | $3,000,000 |
| Steven Chehebar | $70,000 |
| Ezra Shehebar II | $3,000,000 |
| Isaac Shehebar Trust | $5,000,000 |

10. The Chehebars were entitled to receive 25% interest on the loans provided to the Enterprise. This was called "the Chehebar family rate." *See* Exs. B, C.

11. In addition to the 25% interest earned on the capital provided to the Enterprise, the Chehebars also received a share of the Enterprise's profits. *See* Ex. D (Chehebars and CBSG Consulting Agreement) § 3.

12. Isaac, Josef and Eddie were the family ring leaders who personally interacted with the LaForte's and the other RICO Members. *See, e.g.*, Ex. E (text messages between Eddie and Josef).

13. In providing the capital for these criminally usurious loans, the Chehebars secured the capital they advanced through publicly filed UCC liens in 2017 and 2020. In other words, the Chehebars obtained a security interest in the proceeds of the very unlawful loans they funded.

14. Through the use of the Chehebars' capital, the Enterprise issued thousands of criminally usurious loans to small businesses all over the country.

15. The Chehebars and the Enterprise members knew their MCA Agreements were criminally usurious loans because the Enterprise admitted their true nature in marketing materials:

> In short, merchant cash advance **lenders** provide growth opportunity **loans** to small businesses," of which Sunrooms was just one of thousands of businesses across the nation since 2012 that did business with the Enterprise, with "35% interest rates.[1]

16. The Enterprise further admitted their "**loans**" had interest rates of at least 35%:




17. The Chehebars further understood from their interactions with the Enterprise Members that the MCA Agreements had a fixed duration because the "**loans** are usually paid back to the merchant cash **lender** within **100 days** and are done so utilizing an ACH transaction":




[1] The effective interest rates actually ranged from at least 100% to 400%.



33211115v.1

18. The Chehebars knew "the merchant cash advance lender [CBSG] automatically withdraws a payment every single business day from the borrowing company and that "the loan is usually paid off in full in less than 100 days."

19. The Enterprise also admitted through marketing material, to which the Chehebars were privy, that its MCAs were "opportunistic business loans" and that "small companies are not worried about the high interest rate that the money will cost them."

20. The Enterprise further explained through its marketing material that once the borrower enters into the first loan that it would be refinanced and extended with higher amounts of repayment and interest, up to three times per year, generating annual profits of 70% to 90% through the Enterprise's unlawful debt collection:




21. The Chehebars knew they would be funding loans with interest rates in excess of 100%, which violates the usury laws of almost every state that has one, including Florida where the Enterprise was based, and the states of Plaintiffs—New York and New Jersey.

22. Despite the documented form, the Chehebars knew the transactions were fully secured loans because, among other things, each had a security agreement giving the Enterprise a UCC lien on virtually all of the borrower's business assets.

23. In fact, in conducting their due diligence, the Chehebars knew the underlying merchant agreements were "loans," and specifically referred to them as "loans" in conducting their due diligence before getting into bed with the LaForte's loansharking scheme. *See* Ex. C:

**From:** Jeffrey Kaufman [mailto:jkaufmancpa@gmail.com]
**Sent:** Tuesday, September 20, 2016 8:43 AM
**To:** joecole@parfunding.com; JoJo Chehebar <jojo@chehebar.com>; Chuck Frei <cfrei@skiva.com>; Isaac Klein <ik@gideonam.com>
**Subject:** Review

Good Morning Joe,

I have agreed with Jo Jo to do a review of the Loans that CBSG has initiated from January 2015 to date. The plan is to do this from New York. In order to set up the process it would be helpful to have two things to start with. First, is a list of loans initiated during that time so I can pick a sample to review. Second, if possible, to send one sample file that you have for a customer so I can gain an understanding of your files. This will help make the whole thing go smoother.

Thank you for your help in advance.

Jeffrey Kaufman CPA
1318 Davies Road
Far Rockaway, NY 11691
917REDACTED

24. Plaintiffs and the Class Members who entered into these loans invariably could not keep up with the usurious interest rates, and since at least 2016, the Enterprise has filed nearly 2,500 confessions of judgment against its small business victims and their individual owners. Over 750 were filed right here in the State of New York, and thousands of others were filed across the United States. These confessions of judgment, among other unlawful collection tactics, show that the Enterprise treated the transactions as absolutely repayable loans.

25. To this day, the Chehebars continue their efforts to collect on the Enterprise's unlawful debt by enforcing their UCC rights.

26. In addition to the collection of an unlawful debt, the Enterprise also engaged in a pattern of racketeering through wire fraud, extortion, obstruction of justice, and perjury.

27. Plaintiffs now bring this class action to recompense the many thousands of similarly situated victims that have been preyed upon by the Enterprise's collection of unlawful debt and racketeering activity.

## THE PARTIES

28. Counterclaim Plaintiff Sean Whalen ("Whalen") is an adult resident and citizen of California and is co-owner of Flexogenix Group, Inc. d/b/a Flexogenix North Carolina, PC d/b/a Flexogenix Georgia, PC d/b/a Flexogenix, Inc. d/b/a Flexogenix PC.

29. Counterclaim Plaintiff Yingyin Iris Chen ("Chen") is an adult resident and citizen of California and is co-owner of Flexogenix Group, Inc. d/b/a Flexogenix North Carolina, PC d/b/a Flexogenix Georgia, PC d/b/a Flexogenix, Inc. d/b/a Flexogenix PC.

30. Plaintiff Flexogenix Group Inc. ("Flexogenix") is a California corporation owned and operated by Counterclaim Plaintiffs Whalen and Chen, with a principal place of business at 7442 Garvey Ave., Rosemead, California 91770.

31. Counterclaim Defendant GemJ Chehebar Grat, LLC ("GemJ") is Delaware Limited Liability Company.

32. Counterclaim Defendant Josef Chehebar ("Josef") is an individual and resident of New York and a Manager of GemJ.

33. Counterclaim Defendant Isaac Shehebar ("Isaac") is an individual and resident of New York.

## COMMON FACTUAL ALLEGATIONS

### A. The Enterprise

34. Joseph LaForte ("LaForte"), James LaForte ("Jimmy"), Joseph Cole Barletta ("Cole"), Lisa McElhone ("McElhone"), Renato Gioe ("Gino"), Perry Abbonizio ("Perry"), Anthony Zingarelli ("Tony"), Isaac Shehebar ("Isaac"), Ezra Shehebar ("Eddie"), and Josef

Chehebar ("JoJo") and other persons and entities, including Complete Business Solutions Group, Inc., d/b/a Par Funding ("CBSG"), and its affiliate companies defined below, were members and associates of a criminal organization that operated throughout the United States, which engaged in various types of criminal activity, including but not limited to wire fraud, extortionate collection of debt, perjury, obstruction of justice, witness tampering, and witness retaliation.

35. This criminal organization, including its leaders, members, and associates, constituted an "Enterprise" as defined by 18 U.SC. § 1961(4), that is, a group of individuals and entities associated-in-fact. This Enterprise was engaged in, and its activities affected, interstate and foreign commerce. The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.

**B. Relevant Entities**

36. CBSG was formed by LaForte in or around October 2011, in the name of his wife, McElhone. CBSG was incorporated in Delaware.

a. CBSG operated through and in conjunction with several affiliated companies, including Contract Financing Solutions, Inc. ("CFS"), Fast Advance Funding, LLC ("FAF"), Capital Source 2000, Inc., Recruiting and Marketing Services, Inc., and New York Unity Factors, LLC (collectively, the "CBSG affiliates"). CBSG and the CBSG affiliates shared common ownership and/or control, and funds were frequently transferred back and forth between these entities.

b. CBSG and the CBSG affiliates were in the business of funding businesses ("merchants") through short-term financing transactions, which it held out as merchant cash advances ("MCAs"). In these transactions, CBSG purported to purchase these merchants' future receivables at a discounted price. The purchase price was given to the merchant—typically in a lump sum—with the expectation that the merchant-customer would use the funds to operate its business. The merchant agreed to repay CBSG the purchase price advanced to it plus an additional amount, which was typically 30% or more of the purchase price. CBSG generally collected these deferred repayments in installments through automatic daily or weekly debits from the merchant's bank accounts, resulting in interest rates between at least 100% and 400% per annum.

c. CBSG frequently entered "reload" agreements with merchants, which were essentially refinancings of pre-existing MCAs. In a reload, CBSG's new, larger advance typically repaid the amount due on the original advance and provided some additional funding to the merchant.

d. In order to fund these MCAs, CBSG raised capital through the issuance of promissory notes with the Chehebars.

## C. The Common Purpose

37. The common purpose of the Enterprise is to:

a. generate money for its leadership, members, and associates through the commission of various criminal acts, such as wire fraud, the extortionate collection of debt, obstruction of justice, and witness retaliation;

b. conceal from the government, law enforcement, the judicial system, and merchants, LaForte's role as the functional Chief Executive Officer of CBSG, as well as his criminal history through misrepresentations, false statements, and other means;

c. use extortionate means, including threats of violence, to collect money owed to CBSG and the CBSG affiliates by their merchants; and

d. protect the leadership, members, and associates of the Enterprise from detection, apprehension, civil suits, and prosecution by law enforcement.

## D. Structure of the Enterprise

38. LaForte, together with Cole, and McElhone, formed the enterprise in or about 2011 for the principal purpose of controlling and exploiting CBSG and its affiliates for their own personal financial gain. From in or about 2011 until on or about May 23, 2023, when LaForte was arrested and incarcerated on a superseding indictment, the Enterprise expanded to include Jimmy, Gino, Perry, Tony, Isaac, Eddie, and JoJo, among others.

39. LaForte was the leader of the Enterprise, and he was consulted on, and had the final say over, all major decisions. Cole served as the second-in-command, and he handled the day-to-day logistics and administration of much of the Enterprise's financial activities. Jimmy and Perry functioned as supervisors who directed the activities of various employees, agents, and contractors of CBSG and the CBSG affiliates. Jimmy was principally tasked with finding potential merchant-

customers for CBSG and the CBSG affiliates, and Perry was principally tasked with disseminating false and fraudulent statements and omissions generated by the Enterprise to disguise the criminal backgrounds of its leadership, membership and associates, and to defraud merchants into believing they were dealing with a legitimate business. Tony was another supervisor who was tasked with overseeing various schemes of self-dealing perpetuated by the Enterprise. Gino, together with Jimmy, functioned as enforcers who protected the Enterprise's interests including by threatening delinquent merchants and, in the case of Jimmy, using violence and threats of violence to commit obstruction of justice and related crimes. The false statements and schemes of self-dealing were further perpetuated by other members and associates of the Enterprise.

40. McElhone functioned as LaForte's nominee, and she owned CBSG through a trust. She also held the titles of Chief Executive Officer and President of CBSG, although she did not regularly exercise the powers of these offices. McElhone was also the nominal owner of Full Spectrum Processing, the entity to which CBSG's employees were transferred in early 2017. As a result, as of 2017 she was CBSG's sole employee, although she was rarely present at its offices. While serving as the nominal owner and executive of CBSG, McElhone instead ran the day-to-day operations of an unrelated nail salon in Philadelphia, Pennsylvania.

41. The Chehebars funded the Enterprise by injecting the necessary capital to fund the Enterprise and the criminally usurious loans issued to small business merchants, including Plaintiffs and the Class Members.

**E. The Enterprise's Operation of CBSG**

42. LaForte controlled the day-to-day operations of CBSG and the CBSG affiliates and owned and/or operated them indirectly through nominees. Nevertheless, LaForte was not listed on any corporate documents as CBSG's Chief Executive Officer or President, despite serving in these

roles. This structure was utilized to hide his control of CBSG and the CBSG affiliates from the outside world due to his significant criminal convictions, including for financial crimes.

43. LaForte and McElhone caused several companies, Heritage Business Consulting, Inc. ("HBC"), Broadway Advance LLC ("Broadway Advance") and Eagle Six Consultants, Inc. ("Eagle Six"), to be created, to which they directed much of defendant LaForte's income from CBSG and the CBSG affiliates. HBC and Eagle Six were formed in Florida in or about 2014 and 2018, respectively.

44. LaForte (through his nominee McElhone), Cole, Perry, and the Chehebars received compensation from CBSG via consulting agreements. *See, e.g.*, Ex. B (profit sharing calculation).

45. Pursuant to these agreements, entities controlled by LaForte, Cole and Perry were paid quarterly compensation equal to a percentage of the total amount of funding provided by CBSG and the CBSG affiliates to its MCA merchants. This compensation structure financially incentivized the Enterprise Members, including the Chehebars, to cause CBSG and the CBSG affiliates to fund as many MCA s as possible.

46. To generate the capital necessary for CBSG to fund MCAs to merchants that in turn generated the lucrative consulting payments, LaForte, Cole, and James raised at least $48 million from the Chehebars and the Chehebar family. As a result of these fundraising efforts, the Chehebars received millions of dollars in consulting payments, as well as 25% interest payments on the capital advanced to the Enterprise.

47. The CBSG Notes provided by the Chehebars (the "Notes") required the 25% interest to be paid over twelve months, and then their principal investment would be returned in full to the individual Chehebar family member. The Notes also contained a Security Agreement,

which granted the Chehebars a security interest in substantially all of the assets of CBSG its accounts receivables.

**F. The Racketeering Conspiracy**

48. From at least in or about October 2011 through in or about May 23, 2023, in the Southern District of New York and elsewhere, the Enterprise Members, LaForte, Cole, Jimmy, McElhone, Gino, Perry, Zingarelli, along with the Chehebars, each being a person employed by and associated with the Enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, unlawfully and knowingly combined, conspired, confederated, and agreed with each other and with others, to collect unlawful debt in violation of 18 U.S.C. § 1962(b), and to violate 18 U.S.C. § 1962(c), by conducting and participating, directly and indirectly, in the conduct of the affairs of the Enterprise, through a pattern of racketeering activity, as defined in 18 U.S.C., §§ 1961(1) and 1961(5), which pattern of racketeering activity consisted of multiple acts indictable under:

a. 18 U.S.C. § 1962(b) (collection of an unlawful debt);

b. 18 U.S.C. § 1343 (wire fraud);

c. 18 U.S.C. § 894 (extortionate credit transactions);

d. 18 U.S.C. § 1512 (obstruction of justice);

e. 18 U.S.C. § 371 (conspiracy to obstruct justice); and

f. 18 U.S.C. § 1623 (perjury)

49. It was part of the conspiracy that each Enterprise Member agreed that other members and associates of the Enterprise would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

## G. Manner and Means of the Enterprise

50. The manner and means by which the Enterprise Members and associates of the Enterprise agreed to conduct and participate in the conduct of the affairs of the enterprise included, but were not limited to, the following overt acts:

***Collection of Unlawful Debt: 18 U.S.C. § 1962(b)***

51. More than a dozen states, including, but not limited to, New York, Florida, Texas, California, Colorado, Tennessee, Michigan, Maryland and Massachusetts, place limits below 50% per annum on interest rates that can be charged in connection with providing a loan. The loans charged by the Enterprise had interest rates in excess of 100% per annum.

52. The debt, including the debt evidenced by the MCAs constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) and 18 U.S.C. § 1961 because (i) it violates criminal usury statutes and (ii) the rates are more than twice the legal rate permitted those statutes, including Florida where the Enterprise is based and in states where the merchants reside.

53. The interest rate charged by and collected by the Enterprise was twice the interest rate permitted under the laws of at least the following states:

a. New York making it criminally usurious for a commercial business loan of less than $2.5 million to charge an annual interest rate in excess of 25%, N.Y. Penal Law § 190.40;

b. California's criminal threshold for usury is the higher of 10%, or 5% plus the prevailing rate of the Federal Reserve Bank,[2] *see* CA Stats. 1919 p. lxxxiii, § 2, and Stats. 1919, p. lxxxiii, § 3, and Article XV, § 1 of the California Constitution;

[2] Which ranged from 0.36% at the beginning of the Enterprise's reign in 2016, and fell to 0.09 in August 2020, at the time of the Enterprise's demise when LaForte was indicted after the DOJ raid on his home and CBSG' offices discovered that he, as a convicted felon, was illegally possession firearms. Press Release, United States Attorney Office, Eastern District of Pennsylvania, Philadelphia Cash Advance Business Owner Indicted and Detained on Weapon Charges (Aug. 12, 2020), *available at* https://www.justice.gov/usao-edpa/pr/philadelphia-cash-advance-business-owner-indicted-and-detained-weapons-charges

c. Texas law states that loans such as the MCA Agreements funded by Defendants can, at most, assess an interest rate of 28%, Tex. Fin. Code § 303.009(c);

d. Florida law makes it illegal to receive interest on a loan such as the MCA Agreements that exceeds 25%, Fla. Stat. § 687.071;

e. Massachusetts makes it illegal to assess an interest rate more than 20% on loans like that of the MCA Agreements, *see* Mass. Gen. Laws ch. 371 § 249(a);

f. Tennessee allows a maximum of 10% interest on loans greater than $1,000, Tenn. Code Ann. § 47-14-103, and

g. New Jersey law prohibits loans to corporations with interest rates exceeding 50% per annum, N.J. Stat. § 2C:21-19.

54. The MCAs provided by and collected by the Enterprise are loans as a matter of law because, among other things:

a. The Enterprise had full recourse to demand full accelerated repayment of the MCA Agreement loan in the event of a merchant's bankruptcy, and had further recourse against the guarantors to hold them liable as well if the merchant declared bankruptcy;

b. While the MCAs purportedly had reconciliation provisions, the Enterprise ensured that this provision was a sham because the Enterprise could and did arbitrary deny all reconciliation requests per its "sole discretion" right thereof embedded in small print in the MCA Agreement;

c. The Enterprise's MCAs all had fixed terms readily determinable by dividing the repayment amount by the fixed daily remittances;

d. Missing just four payments resulted in default with full acceleration and the Enterprise being able to collect through either (i) direct debiting the entire balance from the merchant's bank accounts; (ii) filing confessions of judgment; (iii) taking a security interest in the entire merchant's assets and/or (iv) holding the merchant's owner responsible for the balance.

e. The MCAs never identified any specific receivables the Enterprise was purchasing;

f. Despite the Enterprise purportedly purchasing "receivables" from the merchants, it was the merchants, not the Enterprise, who were responsible for collecting these presumably already purchased "receivables" and depositing them into the designated bank account from which the Enterprise would draw the ACH debits ("Merchant Seller shall deliver the Receivables

to Purchaser by making Payments to Purchaser pursuant to the terms of this Purchase Agreement") ("Merchant shall ensure that funds adequate to cover any and all amounts to be debited by Purchaser are in the Account . . . . when the Debit is scheduled to be made"); and

g. While the Enterprise represented the daily ACH debit it would make from the business accounts were an "approximation" of the percentage of the merchant's receivables the Enterprise purportedly purchased, these "approximations" were fabrications. Rather, the Enterprise arbitrarily selected a fixed daily amount at the highest rate it believed it could squeeze from the merchants, resulting in interest rates exceeding 400%.

h. Finally, the MCA Agreements stated unambiguously that the Enterprise had full "recourse" to collect on the balance owed, thereby solidifying it as an absolutely repayable loan.

55. The MCAs were also unconscionable. Among these unfair and oppressive provisions, the Enterprise included:

i. A Pennsylvania choice-of-law provision, which was designed to evade the criminal usury laws of Plaintiffs' home state and the Enterprise's home state of Florida;

ii. A Pennsylvania venue provision requiring the Plaintiffs and Class to litigate hundreds of miles aware from their home state;

iii. An unenforceable liquidated damages attorney's fee penalty awarding the Enterprise, and the Enterprise only such that even if the Class merchant was vindicated it would have no attorney's fee relief, 10% of the balance in the event a confession of judgment was filed against the merchant;

iv. A jury trial waiver;

v. A limitation of damages provision;

vi. A personal guaranty by the owner of the merchant;

vii. A provision giving the Enterprise the power of attorney over the merchants (thereby ensuring absolute repayment in the event of default);

viii. A UCC lien on all of the Class Members' assets (further ensuring absolute repayment);

ix. A requirement to purchase business interruption insurance (further ensuring absolute repayment);

x. A provision prohibiting the merchants from taking out other loans or financing with another party (forcing their victims into the vicious cycle of refinancing as was described in their own marketing materials); and

xi. A class action waiver (to prevent merchants like the Class Members here from pooling their resources together to fight organized crime).

56. Consequently, the Enterprise and the Chehebars were entering into a scheme whereby the Chehebars would fund the Enterprise's absolutely repayable loans that would have interest rates of at least 100% annualized, a knowing violation of numerous state's usury laws.

***Wire Fraud: 18 U.S.C. § 1343***

57. The Enterprise engaged in a fraudulent scheme by labeling their MCA Agreements as purchases of receivables when they were in true substance and form absolutely repayable loans. By using these fraudulent labels, the Enterprise was able to use interstate wires and ACH debits to collect upon their unlawful debt in states throughout the United States, included those states that had strong public policies against usury.

58. The Enterprise also engaged in numerous other fraudulent schemes to evade paying taxes and to evade the usury laws of its merchant's home states. In order to evade usury laws, CBSG represented to merchants, courts and law enforcement that it was located in Pennsylvania. But, at the same time, in order to evade paying taxes to the Commonwealth of Pennsylvania and the City of Philadelphia, the Enterprise represented that its principal place of business was located in Florida, and that McElhone conducted all of its business affairs from Florida. That is a lie. In truth, McElhone had nothing to do with conducting the business affairs of the Enterprise, She was at all times the nominee of LaForte, and ran a local nail salon—not a nationwide, criminal loansharking Enterprise. *See* Ex. F (McElhone Indictment).

59. The Chehebars were aware of the Enterprise's scheme to engage in tax evasion in violation of 26 U.S.C. § 7201. And the Chehebars directly benefited from this fraudulent scheme because they shared in the Enterprise's profits.

60. In addition, the Enterprise used CBSG and the CBSG affiliates to funnel proceeds to the Enterprise Members through interstate wires and the use of sham companies used to disguise these payments it its members, leadership, and associates.

61. The Enterprise also used forged documents to obtain fraudulent confessions of judgment against merchants. In doing so, the Enterprise filed in the name of NY Unity Factor, claiming that the debt was purchased and assigned to NY Unity Factor. No such purchase or assignment occurred. Rather, the Enterprise knowingly false representations to obtain these judgments, and even worse, in doing so, the Enterprise used forged signatures of its in-house attorney, Norman Valz. *See* Ex. G (samples of forgeries obtained by NY Unity Factor).

62. As part of their diligence before funding the MCA Agreements, the Chehebars fully understood how the Enterprise intended to dupe borrowers like Plaintiffs and the Class Members into entering into these absolutely repayable loans by disguising them as purchases of receivables.

63. Below is just a small sample of the many fraudulent terms in the Enterprise's MCA Agreements designed to conceal the true nature of the transactions:

i. That the MCA was a purchase of the merchants' future receivables;

ii. That the fixed daily payment under the MCA Agreements were based on an "approximation" of the merchant's receivables;

iii. That the MCA "is not intended to be, nor shall it be construed as, a loan";

iv. That no portion of the amounts paid by the merchants "shall . . . be construed or considered to be interest"; and

v. That the term of the MCA Agreement could change when, in reality, it was always fixed and missing just one payment was a default.

***Extortionate Collection on an Extension of Credit: 18 U.S.C. § 894***

64. The MCAs are also loans as demonstrated by the Enterprise's extortionate collection tactics. These extortionate acts include:

a. Telling a merchant, through Jimmy: "We're coming after you. We're going to split your head open."

b. Advising a merchant, through Gino, that failing to pay could affect "wives, households and children" and could make widows and telling multiple merchants, through Joe, that he would "blow up" their house;

c. Sending thousands of UCC lien notices to merchants' families, friends, neighbors, vendors, customers and other business relations including, in one instance, the merchant's niece and to the school of the merchant's child;

d. Harassing the merchants, their spouses and employees with endless phone calls, email and text messages threatening to destroy their business and/or take everything they have;

e. Forging and doctoring confessions of judgments to obtain fraudulent judgments in New York, including hundreds based upon the forged signature of an attorney and notary;

f. Confessing judgments against merchants for amounts that are grossly exaggerated and in instances where there was no breach of the underlying agreements and no basis for the entry of a confessed judgment;

g. Claiming its MCAs are legitimate purchases of receivables but forcing merchants to sign mortgages that acknowledge the agreements are absolutely repayable loans that charge interest at rates exceeding 400% per annum in violation of various state criminal usury laws; and

h. Taking collateral, such as watches, diamonds, stock certificates, and personal vehicles via threats of violence.

65. The use of these extortionate means is detailed in at least one criminal information and one federal grand jury indictments against the Enterprise's two enforcers, Gino and Jimmy, respectively. *See* Exs. H, I, respectively.

66. The connection between Jimmy and the CBSG Enterprise is set forth in a publicly filed detention letter, dated November 8, 2023 and a related grand jury indictment, dated November 2, 2023 (the "Brooklyn Indictment"). *See* Ex. J (alleging that James is a made member

of an organized crime family who "kicked up" more than $1.5 million in proceeds from the Enterprise's usurious lending to the captain of an organized crime family); Ex. I (alleging that James is a member of a separate criminal enterprise with direct ties to organized crime whose racketeering activities included "loansharking").

67. The Brooklyn Indictment accuses Jimmy and his associates in the organized crime family for criminal acts including "acts of violence, including murder and assault."

68. In a separate grand jury indictment involving the Enterprise here, it is likewise alleged that Jimmy "performed work for defendant JOSEPH LAFORTE at defendant [CBSG] in a variety of roles . . . including express and implied threats of violence, to collect payments from defendant [CBSG]'s customers." *See* Ex. K (the "Philadelphia Indictment").

69. The Philadelphia Indictment also described how Enterprise member Gino served as a separate enforcer for the Enterprise and that Gino "at defendant JOSEPH LAFORTE's direction, contacted delinquent borrowers via phone calls, texts messages, and personal visits to their homes and businesses to make express and implied threats of violence to the merchant-customers and their families, such as threats to stick a fork in a merchant-customer's head or cut off the merchant-customer's hands." *Id.*

70. The Philadelphia Indictment describes in detail how LaForte and his brother Jimmy "knowingly conspired and agreed with Renato Gioe and others . . . to participate in the use of extortionate means . . . to collect and attempt to collect extensions of credit from multiple merchant-customers" and identifies the merchants as "Extortion Victim[s]." *Id.*

71. It is further described how "Defendant JOSEPH LAFORTE directed Renato Gioe and defendant JAMES LAFORTE to travel throughout the United States to make unannounced

personal visits to the businesses and homes of representatives of the merchant-customers, in order to make hostile, threatening, and intimidating communications to these representatives." *Id.*

72. For instance, on or about February 15, 2018, Gino was sent and appeared at the offices of Radiant Images, Inc. where he threatened the life of its owner, and the owner's families' lives if immediate payment was not made to the Enterprise. Gino can be seen entering Radiant's offices from security camera images reproduced below:




73. Gino's enforcement exploits for the Enterprise have even been reported on in the media, such as in a Bloomberg News, an article in which the Chehebars were aware. *See* Ex. L.

74. Gino's collection efforts for the Enterprise were also the subject of a Criminal Information filed in the Eastern District of Pennsylvania, wherein Gino admits that he "worked for the collections department for Complete Business Solutions Group, Inc., doing business as Par Funding . . . .[and] acted as an 'enforcer' and used extortionate means, including express and implied threats of violence, to collect payments from its customers." Ex. H.

75. The Philadelphia Indictment further admits that "[a]fter defendant RENATO GIOE visited these representatives of the merchant-customers, [CBSG] . . . continued to collect funds from the merchant-customers and continued to make hostile, threatening, and intimidating

electronic and telephonic communications as necessary to collect on delinquent credit." *See* Ex. Ex. K ¶ 97; *see also* Ex. H.

***Obstruction of Justice, Conspiracy to Obstruct Justice, and Perjury--18 U.S.C. § 371; 18 U.S.C. § 894; and 18 U.S.C. § 1623***

76. The Enterprise Members and associates of the Enterprise, made and caused others to make false and misleading representations to, and concealed and caused others to conceal material facts from merchant victims, participants in judicial proceedings and law enforcement:

a. The ownership and roles withing CBSG and its affiliates;

b. The location and organization of CBSG and its affiliates;

c. The criminal backgrounds of the Enterprise Members; and

d. The identity of financial interests of the Enterprise Members.

77. The Enterprise leaders, members and associates were financially incentivized to make and cause others to make these misrepresentations and material omissions for financial gain and to evade civil and criminal proceedings against them.

78. Among other things, under the consulting agreements with entities controlled by LaForte, Cole, Perry, and the Chehebars (GemJ Chehebar Grat, LLC), the Chehebars personally received a commission based on a percentage of the funds extended to merchants, regardless of whether the MCAs were successful or profitable for CBSG and its affiliates. In addition, the Chehebars received millions in other compensation from their participation in the Enterprise.

79. By disguising the organizational structure of CBSG, the Enterprise Members also evaded being named in various civil litigations asserting claims of fraud, usury, extortion, and violation of RICO by various merchant victims all across the United States.

80. Further, the Enterprise purposefully disguised and manipulated the organizational structure and location of its operations to evade state usury laws and to evade paying taxes.

81. When it came to paying taxes to the State of Pennsylvania and the City of Philadelphia, the Enterprise Members conveniently pointed to CBSG's purported principal place of business located in Florida.

82. But when it came to enforcing its criminally usurious loans, the Enterprise Members falsely represented to courts throughout the country that CBSG was located and operated out of Pennsylvania.

83. LaForte, Cole, Jimmy, and other members and associates of the Enterprise, took various efforts to conceal their fraudulent scheme, including the following: (1) using aliases and nominees, including to hide their self-dealing; (2) hiding LaForte's role in and control over CBSG from its merchants by among other things, using the alias Joe Mack and Joe Macke; (3) conducting a publicity campaign to conceal negative information regarding LaForte; and (4) testifying falsely during civil depositions and causing others to testify falsely in those court proceedings.

84. The Chehebars were aware of this fraudulent scheme to conceal the true identity of the Enterprise Members, and directly benefitted from the fraudulent scheme by, among other things preventing them from being named in the various class action litigations involving CBSG, which specifically named the John and Jane Doe Investors as Enterprise Members.

85. To be sure, the Chehebars employed the very same attorneys CBSG used to defend against these various class action lawsuits brought by merchant victims like here. *See* Ex. M (email from CBSG counsel to the Chehebars attaching draft declarations).

86. In conspiracy with the Enterprise Members, at least four Enterprise Members and associates of the Enterprise committed perjury in sworn deposition testimony taken in federal court judicial proceedings in order to conceal the identity of the Enterprise Members, including the Chehebars, and their roles within the Enterprise.

87. Specifically, the Enterprise Members and associates of the Enterprise, including LaForte and Cole, gave false testimony during their depositions in civil lawsuits filed against CBSG and others—alleging, among other things, fraud, RICO violations, civil conspiracy, and breach of contract—in the United States District Court for the Eastern District of Pennsylvania, captioned *Fleetwood Services, LLC, Robert L. Fleetwood, and Pamela A. Fleetwood vs. Complete Business Solutions Group, Inc. d/b/a Par Funding; Prime Time Funding; John and Jane Does*, which was docketed at Civil Action No. 18-CV-268 (the "*Fleetwood* lawsuit"), and *HMC Inc. and Kara DiPietro v. CBSG d/b/a Par Funding and Fast Advance Funding*, which was docketed at Civil Action No. 19-CV-3285 (the "*HMC* lawsuit"). *See* Ex. K, ¶ Count 45.

88. In these federal court litigations, "[i]t was a matter material to the litigation to determine who was operating and responsible for the business activities of [CBSG]." *Id.*

89. On or about February 11, 2020, Cole, "in the presence of Attorney No. 1, lied under oath about [LaForte's] involvement in, role at, and control over [CBSG] during a deposition in a federal civil lawsuit pending against [CBSG]" and the John and Jane Doe Investors. Ex. K, ¶ 51.

90. On or about March 5, 2020, LaForte, "in the presence of Attorney No. 1, lied under oath about [Joe's] involvement in, role at, and control over [CBSG] during a deposition in a federal civil lawsuit pending against [CBSG]" and the John and Jane Doe Investors. Ex. K, ¶ 52.

91. On or about March 11, 2020, LaForte and Cole, "along with Attorney No. 1, met with two company employees, [Aida Lau] and [Wendy Lyday], and coached them to lie about [LaForte's] involvement in, role at, and control over [CBSG] during an upcoming deposition in a federal civil lawsuit pending against [CBSG]." Ex. K, ¶ 53.

92. Among other topics, LaForte and Cole lied about who was the boss of and was operating and responsible for all the business activities of, CBSG and the CBSG affiliates.

93. Four of the perjury charges forming the bases of the Philadelphia Indictment, include charges that LaForte, Cole and "Attorney No. 1, both together and individually, advanced the enterprise's purpose by coaching, encouraging, and otherwise directing two Par Funding employees, Person No. 5 and Person No. 6, to give false testimony during their depositions in the *HMC* lawsuit. Among other topics, Person No. 5 and Person No. 6 were coached, encouraged, and otherwise directed to hide that [Joe] was the boss of and was operating and responsible for all the business activities of Par Funding and the Par Funding affiliates." Ex. K, ¶¶ 98-99.

94. In furtherance of this fraudulent scheme, McElhone stated in documents filed with the Florida state government that CBSG had a Florida office at 2000 PGA Blvd, Suite 4440, Palm Beach Gardens, FL 33408, and listed her address as 107 Quayside Drive, Jupiter, Florida 44377.

95. Cole also testified in his deposition in the *Fleetwood Action* that CBSG does not have an office in Philadelphia, but rather has a "Florida domicile."

96. When asked "tell me everyplace CBSG has an office?" Cole responded with "Just Florida," where McElhone works as CBSG's "President."

97. Cole also testified in *HMC* that (1) CBSG has an office in and based out of Florida and pays no city taxes in Philadelphia; (2) that McElhone, a Florida resident, worked out of CBSG's Florida office; (3) that CBSG's only physical location was in Florida; (4) that Cole would have daily conversations about the Enterprise business with McElhone while she was in Florida by phone and email; and (5) that McElhone made decisions for CBSG from Florida. Cole also testified that LaForte is the "director of sales at Par Funding."

98. Similarly, when LaForte was deposed in the *HMC* and *Fleetwood* Actions, he too testified that "CBSG is located in Florida" and does not have an office in Philadelphia. LaForte

reiterated that "Par Funding is a Florida Company." He further testified that his wife McElhone works often out of CBSG's office in Florida.

99. Industry press releases by the Enterprise published on the internet further represented to the public that CBSG d/b/a Par Funding was a Miami based business.

100. Thus, the Enterprise purports to be based solely out of Florida, but only presents itself as having a Pennsylvania office to circumvent Florida's and other state's usury laws.

**INJURY AND CAUSATION**

101. Plaintiffs and the Class Members have been injured and will continue to be injured in their business and property by reason of the Enterprise's and Defendants' violations of 18 U.S.C. § 1962 in an amount to be determined at trial.

***Whalen, Chen, and Flexogenix – California Victims***

102. Flexogenix operates joint care clinics in the Los Angeles, California area and in several other U.S. cities as an affiliate.

103. Flexogenix is owned and operated by Counterclaim Plaintiffs Sean Whalen ("Whalen") and Yingyin Iris Chen ("Chen").

104. Between November 21, 2017, and September 12, 2018, Flexogenix paid the Enterprise, through Broadway Advance, nearly $800,000 in unlawful interest under three prior MCA agreements.

105. The terms of the MCA agreements are as follows:

| **Loan Date** | **Loan Amount** | **Daily Payment** | **Loan Term** | **Total Payback** | **Interest Rate** |
|---|---|---|---|---|---|
| 11/21/2017 | $1,000,000.00 | $6,331.06 | 237 days | $1,500,000.00 | 151.76% |
| 12/1/2017 | $500,000.00 | $4,406.25 | 160 days | $705,000.00 | 215.2% |
| 12/21/2017 | $250,000.00 | $2,556.81 | 132 days | $337,500.00 | 215.81% |

| | | | | | |
|---|---|---|---|---|---|
| **Totals** | **$1,750,000.00** | | | **$2,542,500.00** | |

106. These unlawful and unconscionable interest payments pushed Flexogenix into financial catastrophe by causing it to take out more and more unlawful loans with the Enterprise through CBSG.

107. The terms of these CBSG MCA agreements are as follows:

| Loan Date | Loan Amount | Daily Payment | Loan Term | Total Payback | Interest Rate |
|---|---|---|---|---|---|
| 9/12/2018 | $900,000.00 | $6,331.06 | 199 days | $1,260,000.00 | 150.5% |
| 10/1/2018 | $800,000.00 | $5,628.14 | 199 days | $1,120,000.00 | 150.6% |
| 10/24/2018 | $1,200,000.00 | $7,304.35 | 230 days | $1,680,000.00 | 120.2% |
| 11/20/2018 | $1,000,000.00 | $5,600.00 | 250 days | $1,400,000.00 | 106.99% |
| 12/17/2018 | $500,000.00 | $2,800.00 | 250 days | $700,000.00 | 106.99% |
| **Totals** | **$4,400,000.00** | | | **$6,160,000.00** | |

108. As a direct result of the unlawful and unconscionable terms of these MCA agreements, Flexogenix was ultimately forced to file for Chapter 11 bankruptcy protection.

109. Although the MCA agreements purport to only purchase future receivables, the sham nature of these agreements have been proven by this very action. A true and correct copy of the September 12, 2018 CBSG MCA agreement is attached hereto as **Exhibit O**.

110. For instance, the CBSG MCA agreements prominently stated that provided CBSG "WITH SELLER RECOURSE" on the first page. Ex. O at 1.

111. The first page of the CBSG MCA agreement also listed a fixed term for the MCA agreement, as was the case with the September 18, 2018 MCA deal which listed a fixed term of 199 days. *Id.*

112. Even if the term were not listed prominently, it was unavoidably fixed by simply dividing the Purchased Amount ($1,260,000) by the daily payment amount ($6331.06), which uncoincidentally yields 199 days exactly.

113. The term could not change because CBSG's MCA agreements had no enforceable reconciliation provision; instead it was completely illusory, stating: "CBSG **may**, upon Seller's/Merchant's request, adjust the amount of any payment due under this Agreement at **CBSG's sole discretion and as it deems appropriate** in servicing this Agreement." *Id.* (emphasis added).

114. Moreover, upon information and belief, CBSG did not even have a reconciliation department and as a practice never granted reconciliation to merchants.

115. In addition, the CBSG's MCA agreements never specified the particular receivables it was purportedly purchasing, and made the merchant, including Flexogenix, responsible for collecting receivables that CBSG purportedly purchased and depositing them into a designated bank account from which CBSG would draw the daily remittance. *Id.*

116. CBSG's MCA agreements also have a extremely broad and onerous default provision which would, among other things, declare default and full acceleration of the balance if Flexogenix missed just 4 daily payments over the course of the 199 day term. *Id.* at 13.

117. More significantly, the event of default provision in CBSG's MCA agreements include bankruptcy as an explicit event of default, thereby triggering full acceleration and recourse against the guarantors Whalen and Chen. *Id.* § 3.1(c) (The occurrence of any of the following events shall constitute an "Event of Breach of Representations, Warranties, and Covenants" hereunder . . . (c) Merchant shall admit in writing its inability to pay its debts, or shall make a general assignment for the benefit of creditors, or any proceeding shall be instituted by or against

the Merchant seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts”).

118. That is not all, the personal guaranty executed by Whalen and Chen as part of the CBSG’s form MCA agreements also provided recourse against the guarantors in the event of the merchant’s bankruptcy. *Id.* at 8 (“In the event that [CBSG] must return any amount paid by SELLER/MERCHANT or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor’s obligations shall include that amount”).

119. Thus, the terms and plain language of CBSG’s MCA agreements render them substantively loans, and if that was not enough, their actions further show they treat these MCA agreements, a/k/a “factoring agreements,” as absolutely repayable loans.

120. In addition to filing a proof of claim in Flexogenix’s Chapter 11 bankruptcy proceeding, Counterclaim Defendant CBSG filed the instant lawsuit seeking to hold the individual owners of Flexogenix, Ms. Chen and Mr. Whalen, personally liable for the full unpaid balance of the receivables purportedly purchased.

121. This action thus proves that the Enterprise treats its so-called “factoring agreements” as absolutely repayable loans even if the business fails to generate receipts, fails for any reason, or even files for bankruptcy.

## CLASS ALLEGATIONS

122. Counterclaim Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

123. Counterclaim Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3).

124. Counterclaim Plaintiff Flexogenix (the "Merchant Plaintiff") brings this action individually and on behalf of a class of similarly situated persons defined as follows (the "National Merchant Class"):

> **National RICO Merchant Class**: All merchants that, on or after August 13, 2016, paid money pursuant to a CBSG MCA Agreement funded in whole or in part by Defendants with an interest rate exceeding fifty (50%) in violation of Florida law where the Enterprise operated out of.
>
> **National Usurious Merchant Subclass**: All merchants that, on or after August 13, 2016, paid money pursuant to a CBSG MCA Agreement funded in whole or in part by Defendants that charged an interest rate exceeding twenty five percent (25%) in violation of Florida law where the Enterprise operated out of.
>
> **National UCC Merchant Subclass:** All merchants that, on or after August 13, 2016, had a UCC notice sent by a member of the Enterprise pursuant to a CBSG MCA Agreement funded in whole or in part by Defendants in violation of UCC 9-625.

125. Counterclaim Plaintiffs Whalen and Chen (collectively the "Individual Plaintiffs") bring this action on behalf of similarly situated persons defined as follows (the "National Individual Class," with the National Merchant Class, the "National Class"):

> **National RICO Individual Class**: All individuals who, on or after August 13, 2016, guaranteed a CBSG MCA Agreement funded in whole or in part by Defendants with an interest rate exceeding fifty (50%) in violation of Florida law where the Enterprise operated out of.
>
> **National Individual Subclass**: All individuals who, on or after August 13, 2016, guaranteed a CBSG MCA Agreement marketed funded in whole or in part by Investor Defendants that charged an interest rate exceeding twenty five percent (25%) in violation of Florida law where the Enterprise operated out of.
>
> **National UCC Individual Subclass:** All individuals who, on or after August 13, 2016, had a UCC notice sent by a member of the Enterprise pursuant to a CBSG MCA Agreement funded in whole or in part by Defendants in violation of UCC 9-625

126. Counterclaim Plaintiff Flexogenix brings this action individually and on behalf of a California subclass of similarly situated merchants as defined as follows (the "California Merchant Subclass"):

> **California Merchant Class**: All merchants residing in California that, on or after August 13, 2016, paid money pursuant to a CBSG MCA Agreement funded in whole or in part by Defendants with an interest rate exceeding twenty percent (10%).
>
> **California Merchant RICO Subclass**: All merchants residing in California that, on or after August 13, 2016, paid money pursuant to a CBSG MCA Agreement funded in whole or in part by Defendants with an interest rate exceeding forty percent (20%).

127. Counterclaim Plaintiffs Whalen and Chen bring this action individually and on behalf of a class of similarly situated subclass of California residents defined as follows (the "California Resident Subclass", with the National Class, the "Classes"):

> **California Individual Class**: All individuals residing in California that, on or after August 13, 2016, guaranteed a CBSG MCA Agreement funded in whole or in part by Defendants with an interest rate exceeding twenty percent (10%).
>
> **California Individual RICO Subclass**: All individuals residing in California that, on or after August 13, 2016, guaranteed a CBSG MCA Agreement funded in whole or in part by Defendants with an interest rate exceeding forty percent (20%).

128. The following people and entities are excluded from the Classes defined above: (1) any Judge or Magistrate presiding over this action and members of their family; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; (3) persons who properly execute and timely file a request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits with due process or otherwise released or waived; (5) Plaintiffs' and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded person or entity.

129. **Numerosity**: The exact number of members of the Classes is unknown and not available to Plaintiffs at this time, but individual joinder is impracticable. Based on publicly

available documents, each of the Classes likely number many hundreds or more merchants and/or individuals.

130. Upon information and belief, many thousands more were preyed upon by the Enterprise using usurious MCA Agreements and wire fraud—schemes Defendants were fully apprised of before agreeing to fund the Enterprise's MCA Agreements.

131. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiffs and the other Classes' members, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the National, various State and Subclasses include, without limitation, the following:

132. Whether the MCA Agreements are disguised loans;

133. Whether the choice of law provisions in the MCA Agreements are enforceable;

134. Whether the MCA Agreements are usurious under Florida Law for the National Class and/or New York and New Jersey for the Subclasses; and

135. Whether the Class and Subclasses are entitled to treble damages under RICO;

136. **Typicality:** Plaintiffs' claims are typical of the claims of other members of the Classes. Plaintiffs and the members of the Classes sustained damages as a result of the Enterprise's uniform collection of unlawful debt through usurious loans disguised as MCA Agreements with were funded in whole or in part by Defendants, as well as the wire fraud scheme described above.

137. **Adequate Representation**: Plaintiffs have and will continue to fairly and adequately represent the interest of the Classes and have retained counsel competent and experienced in complex RICO litigation and class actions. Plaintiffs have no interests antagonistic to the those of the Classes, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of all members of the

Classes, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Classes.

138. **Superiority:** This case is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. Absent a class action, it would be difficult, if not impossible, for the individual members of the Classes to obtain effective relief from Defendants.

139. Even if members of the Classes themselves could sustain such individual litigation—which is unlikely since many members of the Classes had all of their business and personal assets taken by the Enterprise—a class action is still preferable because individual litigation would increase the delay and expense to all parties by the Court and require duplicative consideration of the legal and factual issues presented herein.

140. By contract, a class action presents far fewer management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

**FIRST CAUSE OF ACTION (RICO)**
**(Violation of 18 U.S.C. § 1962(d))**

141. Counterclaim Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

142. Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated with members of the Enterprise to violate 18 U.S.C. § 1962(d) by the conduct of collection of unlawful debt and a pattern of racketeering in violation of 18 U.S.C. § 1962(d)

143. Defendants each agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs by being the critical funders of the MCA

Agreements by which the Enterprise would collect unlawful debts, in violation of 18 U.S.C. § 1962(c).

144. In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs and agreed to conspire with the Enterprise in its goal of collecting unlawful debt through the use of MCA Agreements that Defendants were explicitly told would be funded with their capital.

145. Defendants further agreed to facilitate, conduct, and participate in the conduct, management or operation of the Enterprise's affairs in order to commit various overt predicate acts, including wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Specifically, each Defendant was told repeatedly that the MCA Agreements were "loans" that would be negotiated and executed using interstate wires with borrowers across the United States, and that the MCA Agreements were be repaid using interstate ACH debits.

146. These fraudulent statements coupled with the interstate activities associated therewith, namely the interstate wires to negotiate and execute the MCA Agreements and interstate ACH debits the Enterprise used to collect the unlawful debt, constitutes wire fraud for the purposes of 18 U.S.C. § 1962(c).

147. The participation and agreement of Defendant and each Enterprise member was necessary to allow the commission of this scheme. Indeed, the mastermind of the Enterprise, Joseph LaForte, was a convicted felon on multiple counts by the time the Enterprise was fully operational in 2012 and LaForte would have been unable to launch the Enterprise's goal of collecting unlawful debt unless he and the Enterprise had co-conspirators like Defendants to fund the MCA Agreements.

148. Plaintiffs and the Classes have been and will continue to be injured in their business and property by reason of Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at a hearing, but believed to exceed $600 million.

149. The injuries to the Plaintiffs and Classes directly, proximately, and reasonably foreseeably resulting from or causing these violations of 18 U.S.C. § 1962(d) consist of improperly collected loan payments.

150. Plaintiffs and members of the Classes have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting the Enterprise's criminal activities funded by Defendants, and defending themselves from lawsuits by the Enterprise.

151. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and the Classes are entitled to treble damages, plus costs and attorneys' fees from Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of those similarly situated, demand judgment in their favor against Defendants, jointly and severally, and respectfully request entry of an order from this Honorable Court:

a) Certifying this case as a class action on behalf of the Classes defined above and appoint Plaintiffs as Class representatives and appoint their undersigned attorneys as class counsel;

b) Awarding the Plaintiffs and Class members direct and consequential damages;

c) Awarding Plaintiffs and the Class members treble damages pursuant to 18 U.S.C. § 1964(c);

d) Awarding Plaintiffs and the Class members their attorney's fees and costs incurred in this action pursuant to 18 U.S.C. § 1964(c) and

e) Granting such other and further relief as this Court deems just and proper.

Date: August 12, 2024

**WHITE AND WILLIAMS LLP**

By: ______________________
Shane R. Heskin
Alex D. Corey
One Liberty Place, Suite 1800
1650 Market Street
Philadelphia, PA 19103
(212) 244-9500 or (215) 864-6329
heskins@whiteandwilliams.com

**ALMEIDA LAW GROUP LLC**
David S. Almeida, Esq.
849 W. Webster Avenue
Chicago, Illinois 60614.
(312) 576-3024
david@almeidalawgroup.com
*Counsel for Plaintiffs*